Colorado PUC E-Filings System

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF COLORADO**

**PROCEEDING NO. 18R-0492E**

_____

**IN THE MATTER OF THE PROPOSED AMENDMENT TO RULES REGULATING ELECTRIC UTILITIES IN RELATION TO QUALIFYING UTILITIES, 4 CODE OF COLORADO REGULATIONS 723-3-3902(c)**

---

### INITIAL COMMENTS OF PUBLIC SERVICE COMPANY OF COLORADO

---

Pursuant to the Notice of Proposed Rulemaking opening this rulemaking proceeding, Decision No. C18-0601 (mailed date July 25, 2018) ("NOPR"), Public Service Company of Colorado ("Public Service") hereby provides its initial comments regarding the proposed amendment to Colorado Public Utilities Commission ("Commission") Rule 3902(c), 4 *Code of Colorado Regulations* 723-3-3902(c). Public Service reserves the right to provide further comments, including responsive comments to other party comments, as contemplated by the NOPR.

### INTRODUCTION AND SUMMARY OF COMMENTS

Commission Rule 3902(c) currently provides as follows:

> A utility shall use a bid or an auction or a combination procedure to establish its avoided costs for facilities with a design capacity of greater than 100 kW. The utility is obligated to purchase capacity or energy from a qualifying facility only if the qualifying facility is awarded a contract under the bid or auction or combination process.

4 *Code of Colorado Regulations* 723-3-3902(c). The NOPR proposes to strike the second sentence of Rule 3902(c) "because it conflicts with Commission practice and rules, including without limitation, Rule 3615(a), which exempts projects of not more than 30 MW from the standard provisions requiring competitive bidding in the ERP Rules." NOPR at 3, ¶ 6. The NOPR adds that "[b]y striking the second sentence of

Rule 3902(c), the Commission clarifies that the ERP process is not the only opportunity for QFs to receive a contract or legally enforceable obligation from a utility." *Id.* Public Service appreciates the Commission's desire and effort to make its rules regulating Qualifying Facilities ("QFs")[1] more consistent, and in these initial comments proposes an alternative amendment to Rule 3902(c) for the Commission's consideration.

As detailed herein, Rule 3902(c) is consistent with PURPA, has worked remarkably well, and continues to work well to ensure PURPA compliance while also protecting customers from long-term, above-market contracts and allowing electric utilities to effectively and fairly manage resource acquisition.  It fulfills PURPA's mandate that electric utilities are only required to purchase capacity and energy from QFs at a rate based on the costs the utility avoids in not obtaining that power from an alternative source.  It thereby ensures that the utility's customers are indifferent to the mandatory purchases required under PURPA's Section 210 by protecting customers from paying more for QF-supplied power than they would for other power.

Commission Rule 3615(a), referenced in the NOPR, excludes certain resources from the requirement to be included "in an approved resource acquisition plan prior to acquisition," including "[c]apacity and/or energy from the generation facilities of other utilities or from non-utility generators pursuant to agreements for not more than a two year term (including renewal terms) or for not more than 30 MW of capacity."  Rule 3615(a)(iii).  If the Commission is concerned that the second sentence of Rule 3902(c)

---

[1] Pursuant to the Public Utilities Regulatory Policies Act of 1978, Pub. L. No. 95-617, 92 Stat. 3117 (1978), ("PURPA"), and regulations promulgated by the Federal Energy Regulatory Commission ("FERC") in furtherance of PURPA, a Qualifying Facility is defined as small generation facility or cogeneration facility that meets the size and standards criteria specified by FERC at 18 CFR 292.203, and either "has filed with the Commission a notice of self-certification, pursuant to § 292.207(a); or has filed with the Commission an application for Commission certification, pursuant to § 292.207(b)(1), that has been granted."  18 CFR 292.203(a),(b).

may be seen to conflict with Rule 3615(a), then a more tailored amendment may be in order, as follows:

> A utility shall use a bid or an auction or a combination procedure to establish its avoided costs for facilities with a design capacity of greater than 100 KW. ***EXCEPT AS PROVIDED IN RULE 3615(a), T***~~T~~he utility is obligated to purchase capacity or energy from a qualifying facility only if the qualifying facility is awarded a contract under the bid or auction or combination process.[2]

The primary benefit of adopting this more narrowly tailored approach is that it will continue to protect Colorado utility customers by retaining the current rule's connection to market realities. Stated another way, if the Commission strikes the second sentence of Rule 3902(c) altogether, a QF—who is not a low-cost provider—may (and likely will) attempt to invoke the Section 210(a) "must-buy" provision of PURPA. 16 U.S.C. § 824a-3(a)(2). In that scenario, the QF would be seeking to force a utility to purchase power at a rate greater than the cost rate established by bid, auction, or combination process—a rate that would, by definition, put the utility customer in a worse position than if the utility would have contracted with the winning bidder. Accordingly, counter to the mandate of PURPA, utility customers being forced to pay for power from the QF would not be held harmless, and they would not be indifferent to having to pay for power at the higher QF rate. For that reason, it is perfectly consistent with PURPA to establish avoided costs by reference to competitive market realities.

While the first sentence of Rule 3902(c) will remain, per the NOPR, and should still serve to limit _the rate_ a QF can demand based on prices established through a competitive bid or auction process, it is the second sentence of the rule that governs the creation of _the obligation_ for the utility to purchase power from the QF, except as

---

[2] _See also_ Attachment A setting forth this potential alternative language in legislative format.

provided in Rule 3615(a).   If the second sentence is stricken, it is reasonably foreseeable that certain QFs will opportunistically seek to displace low-cost bidders, creating tangible harm to the winning bidders and utility customers required to foot the higher bill for above-market QF-supplied power, while also creating unnecessary resource acquisition complexities for the Commission that do not yield customer benefits.

Indeed, just five days after the NOPR was released, sPower Development Company, LLC ("sPower"), filed 17 applications asking that the Commission determine that *in 2016*, sPower established a legally enforceable obligation with Public Service for 17 solar and wind projects that represent nearly 1,400 MW of generation.   In short, sPower seeks to compel Public Service to purchase power from sPower facilities at Public Service's "avoided cost rate calculated at [that] time (*i.e.*, in 2016)"[3] — a rate that is significantly higher than the prices that have emerged from Public Service's most recent RFP.   Incredibly, sPower requests these adjudications notwithstanding the fact that the second sentence of Rule 3902(c) was in place in 2016 (and remains in place today), and even though sPower was not awarded a contract under Public Service's bid or auction or combination process.   This recent activity demonstrates that the risk to utility customers and winning bidders is not merely hypothetical.

It is also unlikely that striking the second sentence of Rule 3902(c) will prevent further litigation over these issues in any event.   As the Commission is aware, sPower is challenging the second sentence of Rule 3902(c) in federal court.[4]   During an August 8,

---

[3] *See* Proceeding Nos. 18A-0505E – 18A-0521E.  sPower filed a single similar application involving Black Hills Colorado Electric, Inc. ("Black Hills") (Proceeding No. 18A-0524E).

[4] *See sPower Development Company, LLC v. Colorado Public Utilities Commission, et al.*, United States District Court for the District of Colorado, Civil Action No. 17-cv-00683-CMA-NYW.

2018 status conference in that case, sPower indicated that it may seek to assert new claims in federal court even if the Commission amends Rule 3902(c) as proposed by the NOPR.  For all of these reasons, Public Service offers an alternative amendment that brings consistency to the rules while continuing to protect customers from long-term, above-market contracts and retaining the framework that has served Colorado well for decades.

Public Service anticipates fully addressing these issues in detail in these sPower application proceedings, but the filing of these applications just five days after the release of the NOPR, *before* the Commission has acted or even taken comments on the proposed amendment to Rule 3902(c), should sound a cautionary note.  What filings may follow from sPower or other QFs if the Commission actually *does* strike the second sentence of Rule 3902(c)?  Public Service urges the Commission to proceed thoughtfully and consider the full ramifications of abandoning now a rule that has worked well for decades in balancing the often competing considerations involved in utility resource planning and acquisition.

At a minimum, if the Commission does decide to strike the second sentence of Rule 3902(c) as proposed in the NOPR, it should make clear two things.  First, the Commission should expressly provide that this rule change will apply only prospectively. While that is of course blackletter law,[5] sPower's application proceedings effectively

---

[5] *See* § 24-4-102(15.), C.R.S. (defining a rule as "the whole or any part of every agency statement of general applicability and **future effect** implementing, interpreting, or declaring law or policy or setting forth the procedure or practice requirements of any agency.") (emphasis added); *see also* Decision No. R01-119-I, Docket No. 98P-240G (mailed date Feb. 8, 2001) (rulemakings involve prospective rulings of general applicability); Decision No. C96-11, Docket No. 94M-583T (mailed date Jan. 10, 1996) (proceeding was not "a rulemaking proceeding because it does not purport to establish prospective and generally applicable policy.").

seek the retroactive application of any change to Rule 3902(c) and therefore warrant a clear statement from the Commission on this point.  The Commission's decision should foreclose any argument that QFs, in the past, were not required to satisfy the second sentence of Rule 3902(c) to invoke PURPA's "must-buy" obligation.  Second, with regard to Rule 3615(a) and the NOPR's statement that "the ERP process is not the only opportunity for QFs to receive a contract or legally enforceable obligation from a utility," the Commission should make clear that this statement refers *only* to Rule 3615(a), and was not intended to suggest there have always been a number of alternative paths for QFs to receive a contract or create a legally enforceable obligation under PURPA, notwithstanding the clear language of the second sentence of Rule 3902(c).  In other words, while it may have been true and may remain true that, without being awarded a contract through a bid, auction, or combination process, QFs may establish legally enforceable obligations for facilities either less than 30 MW or for terms less than two years, per Rule 3615(a)(iii), the NOPR did not intend to suggest any other, unspecified exceptions to the requirements of the second sentence of Rule 3902(c).

In the remainder of the document, we take on three primary topics.  First, we discuss how Rule 3902(c), as currently comprised, complies with PURPA.  Second, we recount how Colorado's competitive bidding approach has worked well—resulting in high penetrations of renewable generation (including QFs and other small power producers) while simultaneously protecting customers from above-market contracts.  Finally, we briefly address the potential for unintended consequences that could follow from a move away from the well-established framework of Rule 3902(c).

## DISCUSSION

### I.     The second sentence of Rule 3902(c) complies with PURPA

The second sentence of Rule 3902(c) provides that, with regard to a utility purchasing power from QFs, "[t]he utility is obligated to purchase capacity or energy from a qualifying facility only if the qualifying facility is awarded a contract under the bid or auction or combination process."  As noted, sPower has asserted in a federal court proceeding that this second sentence of Rule 3902(c) does not comply with PURPA. While it is not Public Service's intent here to offer a full legal argument demonstrating that this provision is, in fact, consistent with PURPA, it is nonetheless important to wade into these waters to a degree, to dispel any misperception that this sentence must be stricken for the Commission's rules to come into compliance with PURPA.

As background, it is important to first note that states have broad authority and broad discretion in determining how to implement PURPA.[6]  For instance, federal courts and FERC have both recognized that state regulatory agencies have wide latitude in promulgating standards for establishing legally enforceable obligations under PURPA.[7]

This Commission exercised its broad authority under PURPA in developing Rule 3902(c)'s competitive bidding mechanism.  The Commission's reliance on competitive market forces to implement PURPA's requirements is, in fact, perfectly consistent with

---

[6] *See, e.g., Power Res. Group, Inc. v. PUC*, 422 F.3d 231, 236 (5th Cir. 2005); *Indep. Energy Producing Assoc., Inc. v. Cal. Pub. Utilities Comm'n.,* 36 F.3d 848, 856 (9th Cir. 1994); *see also Policy Statement Regarding the Commission's Enforcement Role under Section 210 of the Public Utility Regulatory Policies Act of 1978*, 23 FERC ¶ 61,304, 61,646 (1983) (providing that states have a wide degree of latitude in establishing  an implementation plan for Section 210 of PURPA).

[7] *See, e.g., Power Res. Group,* 422 F.3d at 239 (finding that the "[Texas] PUC acted within its discretion and properly implemented FERC's regulations regarding when a LEO is created," in determining that a legally enforceable obligation arises only when a qualified facility can deliver power within 90 days. The Fifth Circuit further observed that: "FERC regulations grant the states discretion in setting specific parameters for LEOs." *Id.* at 238 (citing *Jersey Central Power & Light Co.*, 73 F.E.R.C. P61,092, 61,297 (Oct. 17, 1995), and *Metropolitan Edison Co.*, 72 F.E.R.C. P61,015, 61,050 (July 6, 1995).

PURPA, as a cardinal tenet of PURPA requires that utility customers be indifferent to the utility's purchase of capacity and energy from a QF.[8]  This principle is reflected in PURPA's avoided cost pricing standard, which generally provides that the rate for "must-buy" purchases from QFs pursuant to Section 210(a) be established based on the incremental costs the utility would otherwise incur if it did not purchase from the QF.[9]

If Public Service were required to purchase capacity and energy from a QF through  a contract *not* based on a bid, auction or combination process, then it is axiomatic that Public Service would avoid no costs.  Indeed, it would almost certainly incur *additional* costs in being required to purchase from a provider other than a low cost bidder.  And those higher costs would be borne by Public Service's customers, in direct contravention of PURPA's mandate that customers should be held harmless when a public utility is required to purchase capacity and energy from a QF.

Further, FERC has long endorsed the use of competitive bidding to establish avoided cost rates, precisely for the logical reason that a competitive process will

---

[8] *See, e.g.,* FERC Order No. 69, 45 Fed. Reg. 12214, 12219 (Feb. 25, 1980) ("Under the definition of 'avoided costs' in this section, the purchasing utility must be in the same financial position as it would have been had it not purchased the qualifying facility's output."); *Southern California Edison Company*, 71 FERC ¶ 61,269, 62,080 (1995) (the "intention [of PURPA] was to make ratepayers indifferent as to whether the utility used more traditional sources of power or the newly encouraged alternatives."); *see also* Commission Decision No. R03-0687, Proceeding No. 02A-665E (mailed June 18, 2003) ("a rate cannot 'exceed' the incremental cost to the electric utility of alternative electric energy.").

[9] *See* 16 U.S.C. § 824a-3(b), entitled "Rates for Purchases by Electric Utilities," which provides as follows:

The rules prescribed under subsection (a) shall insure that, in requiring any electric utility to offer to purchase electric energy from any qualifying cogeneration facility or qualifying small power production facility, the rates for such purchase—

(1) shall be just and reasonable to the electric consumers of the electric utility and in the public interest, and

(2) shall not discriminate against qualifying cogenerators or qualifying small power producers.

No such rule prescribed under subsection (a) shall provide for a rate which exceeds the incremental cost to the electric utility of alternative electric energy.

8

establish the lowest cost at which a resource can be acquired.[10]  Indeed, as FERC has observed, "[t]o the extent bidding successfully identifies a utility's lowest cost alternative supply option, bidding cannot, by definition, depart from the avoided cost standard.  By simulating the outcome of a competitive and unregulated market, bidding would satisfy the original purpose of the avoided costs rule."[11]  That purpose, as previously noted, is to hold utility customer harmless from PURPA-required purchases of power from QFs: "Congress made it clear that it did not intend for utility ratepayers to subsidize [QFs]."[12] Accordingly, many states appropriately rely on some manner of competitive bidding or auction mechanism in their approach to PURPA implementation.[13]

While FERC has determined that *specific* competitive bidding models in Connecticut and Montana did not comply with PURPA, this in no way signals a retreat from FERC's overall support of competitive bidding in PURPA implementation.  Rather, in those situations QFs were effectively denied the ability to offer to sell power to utilities *at all*, based on the infrequency of resource planning and acquisition proceedings and

---

[10] *See, e.g., FERC Statutes and Regulations* ¶ 32,021, 32,025 (1988) ("[B]idding has the potential for eliminating the seemingly endless debates over what alternative sources of supply are truly avoided by the purchasing utility.  Avoided cost need not be an administratively determined number, argued over by experts.  Instead, avoided cost could be derived simply and directly from the prices offered by competing suppliers in the bidding process.  Because bidding provides a systematic mechanism for identifying potential suppliers, it increases the chances that the purchasing utility's capacity needs will be supplied from the more efficient sources.").  Competitive bidding is also consistent with PURPA itself, as amended by the Energy Policy Act of 1992, which requires that states consider the uses of integrated resource planning to evaluate "the full range of alternatives."  16 U.S.C. § 2602(19).

[11] *Id.* at 32,026.

[12] *Id.*

[13] Indeed, back in 1993 FERC determined that it no longer needed to proceed with a rulemaking that it had noticed to adopt regulations clarifying that states have the discretion to use bidding procedures as part of their PURPA implementation.  *See Regulations Governing Bidding Programs*, FERC Stats & Regs. ¶ 32,455 (1988) ("*Bidding NOPR*").  FERC terminated that rulemaking in large part because it determined that its guidance was no longer necessary, given the prevalence of state bidding programs, which FERC endorsed: "At the time of the Bidding NOPR only a few states had taken steps to allow competitive bidding.  Now 30 states use competitive bidding . . . .Thus, both state regulatory commissions and utilities appear to be making substantial progress without the need for additional Commission guidance." 64 FERC ¶ 61,364, 63,491 (1993).

other factors practically limiting QFs' ability to obtain a contract.[14]   By contrast, Public

Service's competitive resource solicitations are frequent (six in the past twelve years),

include both wind and solar components (indeed, three have been specific wind or solar

solicitations), are fully open to QFs, and QFs have participated in those solicitations and

been awarded contracts.[15]   And FERC has made clear that "[p]rovided QFs are given

an equal opportunity to compete for capacity in a bidding process, QFs are not

discriminated against as a class."[16]   In Colorado, QFs have been given, and continue to

be given, the opportunity to fully participate in Public Service's resource acquisition

proceedings.

Further, this Commission has already found that these two FERC decisions

involving Connecticut and Montana do not represent a departure from FERC's

longstanding endorsement of competitive bidding: "*Hydrodynamics and Wyndham* do

not overturn longstanding encouragement from FERC that an all-source competitive

solicitation is an effective method to determine avoided costs."[17]   In addition, unlike a

district court declaratory order, FERC's declaratory rulings are not binding FERC

---

[14] *See Hydrodynamics Inc.,* 146 FERC ¶ 61,193 (2014), *Windham Solar LLC*, 156 FERC ¶ 61,042 (2016). As the Commission is aware, these FERC decisions are non-appealable and non-binding as they were the result of a request to initiate an enforcement action pursuant to Section 210(h)(2)(A) of PURPA. *See, e.g., Cogenerators v. Federal Energy Regulatory Comm'n*, 47 F.3d 1231, 1235 (D.C. Cir. 1995) (a FERC declaratory order under PURPA "merely advise[s] the parties of the [FERC's] position," and is "much like a memorandum of law prepared by the FERC staff in anticipation of possible enforcement action."); *Exelon Wind 1, LLC v. Nelson*, 766 F.3d 380, 391 (5th Cir. 2014) ("While this FERC-issued document is rather impressively called a Declaratory Order, it is actually akin to an informal guidance letter."). Further, in any event, such FERC "declaratory orders" provide guidance limited to the specific facts and circumstances presented in the enforcement request, and should not be considered broad pronouncements on general policy applicable in all situations. *See, e.g., Puget Sound Energy, Inc.*, 139 FERC ¶ 61,241, 62,742 (2012); *ITC Grid Development, LLC*, 154 FERC ¶ 61,206, ¶ 45 (2016).

[15] Additionally, consistent with Rule 3615(a)(III), Public Service has entered into numerous contracts with smaller QFs despite such QFs not being "awarded a contract under the bid or auction or combination process."  QFs satisfying the exemptions and exclusions in Rule 3615(a) have not been denied contracts on the basis of 3902(c).

[16] *FERC Statutes and Regulations* ¶ 32,021, 32,026.

[17] Decision No. C16-1156-1, Proceeding No. 16A-0396E, at pp. 5-6, ¶ 15  (mailed date Dec. 19, 2016).

decisions.[18]  They are not rulemakings of general applicability.  They are not a

pronouncement of broad policy.  Rather, they are merely advisory guidance based on,

and limited to, the specific facts and circumstances of the situation presented.  This

Commission recognized this as well, finding that "[t]hese [FERC *Hydrodynamics and*

*Wyndham*] determinations are limited to the specific facts presented and are not binding

precedent in Colorado.[19]   Indeed, in distinguishing these FERC declaratory orders, this

Commission correctly noted: "In both *Hydrodynamics and Wyndham*, QF petitioners

established that they were effectively foreclosed from participating in state bidding

schemes due to infrequency of, and preconditions to, competitive solicitations. In

contrast, Colorado has frequent ERP solicitations in which QFs are provided regular

opportunity to bid and obtain long-term contracts."[20]

## II.   The Commission's competitive bidding approach to PURPA implementation has worked well, and will continue to work well

The use of competitive bidding to implement and administer PURPA has worked

well in Colorado for three decades consistent with the underlying purpose of PURPA, to

promote and integrate non-traditional generation and renewables.  Competitive bidding

as a means to implement PURPA, in one form or other, has been well vetted by the

Commission, incorporating the input of diverse stakeholders including QF developers,

other independent power producers, environmental interests, industrial and commercial

customers, utilities, Commission Staff, and the Colorado Office of Consumer Counsel,

among others.  In 1988, the Commission determined that Public Service, "as part of its

continuing duty to implement PURPA [should] use a biennial bidding procedure to

---

[18] *See supra*, fn. 14.

[19] Decision No. C16-1156-I at p.5, ¶ 15.

[20] *Id.* at p. 5, ¶ 15, n. 12.

establish its avoided costs."[21]   The Commission found that "a bidding procedure is necessary to ensure both the reliability and adequacy of Public Service's system and that customers of Public Service will not over- or under-pay for QF power.  Moreover, a bidding procedure will enable Public Service to obtain the lowest-priced QF power available which will ensure [sic] to the benefit of its customers."[22]

In 1992, when the Commission developed its integrated resource planning ("IRP") rules and procedures, this biennial QF bidding was retained as a stand-alone process with the results of the QF bidding reflected in the IRP,[23] in order to ensure a competitive resource acquisition process that would "allow the Commission to comply with its continuing responsibility to implement PURPA."[24]   When the Commission revised its IRP rules in 1995-1996, it again retained this competitive bidding approach by implementing a single bidding procedure for all-source competitive resource acquisition, superseding the biennial QF stand-alone bidding process.[25]   In 2002, the Commission amended its IRP rules, but once again retained competitive bidding as the foundation of resource acquisition and compliance with PURPA.  The current QF rules, including the competitive bidding provisions incorporated in Rule 3902(c), were adopted in 2005.[26]

In short, Colorado's competitive bidding approach has served as a cornerstone of the Commission's PURPA compliance for over thirty years.  It has worked.  And it works

---

[21] Decision No. C88-726, Application No. 38771 (June 9, 1988).

[22] *Id.*

[23] *See* discussion in Decision No. R03-0687, at ¶ 50, Proceeding No. 02A-665E (mailed date June 18, 2003) (citing Decision No. C92-1646).

[24] Decision No. C95-1264, Proceeding No. 95R-071E, at p. 6 (mailed date Dec. 15, 1995).

[25] *Id.* at pp. 13-14.

[26] Decision No. C05-1081, Proceeding No. 03R-519E (mailed date Sept. 9, 2005).

still today.  The Commission's approach to effectively managing utility resource planning through its ERP process and framework has fostered a marketplace that is as competitive as anywhere in the country, and includes extensive non-utility owned generation   This marketplace is the result of decades of deliberate and considered effort by this Commission and its stakeholders, and the PURPA implementation approach set forth in Rule 3902(c) is an integral part of it.  As a case in point, the market structure developed by this Commission resulted in an unprecedented response to the most recent Phase II competitive solicitation that brought in over 400 bids and generated prices for wind, solar, and solar with storage that are largely unparalleled in other electricity markets across the country.[27]

In addition, Colorado's renewables landscape has evolved significantly since the Commission first adopted its QF rules.  Public Service has already exceeded its mandated renewables standard (30% by 2020) set forth in § 40-2-124(1)(c)(I)(E), C.R.S., and will approach nearly 55% renewable energy by 2026 driven by over 1,800 MW of new wind and solar generation through the most recent solicitation alone if its Preferred Colorado Energy Plan Portfolio is approved by the Commission in Phase II of Proceeding No. 16A-0396E.  At this point, Public Service is adding renewables through the ERP process based on economics and customer benefits, not acquisition mandates.

There is nothing to suggest that renewable resources are languishing in Colorado, requiring the spur of PURPA to facilitate their deployment.  PURPA was enacted in 1978 to reduce the nation's dependence on fossil fuels.  Section 210 of

---

[27] *See, e.g., Why a Big Utility is Embracing Wind and Solar*, Justin Gillis and Hal Harvey, New York Times (Feb. 6, 2018), available at: https://www.nytimes.com/2018/02/06/opinion/utility-embracing-wind-solar.html.

PURPA sought to accomplish that goal by encouraging the development of non-traditional electricity generating facilities, such as those that use renewable resources. That goal has certainly been achieved in Colorado.  While Section 210's "must-buy" requirement nonetheless remains 40 years later, it does not allow a QF to leverage that requirement to simply displace a winning bidder in a competitive resource acquisition proceeding.  However, if the second sentence of Rule 3902(c) is stricken, a QF *could* displace a winning bidder whether or not the QF elected to participate in the competitive acquisition process.  Notably, PURPA does not require that a QF be given the opportunity—after winning bids have been announced—to match the winning bid. Indeed, FERC concluded that such a scheme would run counter to PURPA's objectives. Specifically, FERC has noted: "providing QFs with an opportunity for a 'second bite' is likely to discourage the other potential power suppliers from participating in the bid."[28] In short, a material movement away from the current framework will only serve to undermine the ERP process that has made Colorado a leader in renewable development.

The Commission's ERP rules and procedures have also been very successful in encouraging renewable development by small power producers, and they have produced competitive resource pricing.   Public Service's most recent Phase II competitive solicitation generated some of the lowest cost resources ever offered. These low prices enable Public Service to provide cleaner energy in a cost-effective way.  Rule 3902(c) in particular, in its current form, has many advantages.  It fosters administrative efficiency and avoids protracted battles that are frequently associated

---

[28] *FERC Statutes and Regulations* ¶ 32,021, 32,028.  *See also City of Ketchikan, Alaska, et al.*, 94 FERC ¶ 61,293 (2001) (finding that PURPA does not require a utility to pay for capacity that would displace its existing capacity arrangements).

with determining avoided cost pricing, as FERC has noted.[29]   It also avoids saddling customers with above-market prices for energy and capacity.   Moreover, it ensures that all renewable providers, not just QFs, have an opportunity to fairly compete in resource acquisition proceedings.

There is abundant evidence that the Commission's QF rules, including Rule 3902(c) as currently comprised, are working well, and that that there is no need to strike the second sentence of Rule 3902(c) to ensure QFs have a place in the market.   As Public Service shared in the July 11, 2018 workshop focusing on the rules as they relate to  QFs, and the history of QF projects in Colorado,[30] 70% of Public Service's active renewable PPAs (28 contracts) are with projects that could qualify as QFs.   These contracts represent 423 MW or 14% of the renewables on Public Service's system, above the national average.   Further, 21 of those contracts, representing 284 MW, were entered into in 2007 or later.

### III.   Striking the second sentence of Rule 3902(c) may have unforeseen and unintended consequences

As previously described, just five days after the Commission issued the NOPR, sPower filed 17 applications asking that the Commission adjudicate that 17 sPower projects established legally enforceable obligations _in 2016_ to sell capacity and energy to Public Service.   In other words, sPower seeks to force Public Service to take (and our customers to pay for) approximately 1,400 MW of generation priced at a rate well above those seen in the Company's most recent all-source solicitation.   In order to achieve that, sPower's applications appear to simply ignore that Rule 3902(c)'s second

---

[29] _See supra,_ fn. 10.

[30] _See_ NOPR at 2, ¶ 3.

sentence provided, in 2016 (and still today), that an electric utility is required to purchase power from a QF only if the QF has been awarded a contract under the bid or auction or combination process.  sPower has not been awarded such a competitive bid contract.  Thus, *if* the Commission determines to strike the second sentence of Rule 3902(c) as proposed by the NOPR, it should be prepared for sPower to argue for a that this rule change should apply retroactively.

Public Service will address this issue, and other issues raised by these 17 sPower applications in those proceedings.  For purposes of this rulemaking proceeding, sPower's applications serve to underscore the potential risk associated with departing from the competitive bidding approach to settling the question of when a utility is obligated to purchase from a QF under PURPA.  It is not difficult to envision a cascade of filings similar to sPower's applications if the second sentence of Rule 3902(c) is stricken; the fact that sPower unleashed its applications even *before* the Commission has taken initial comments in the rulemaking is telling in that regard.  While it is true that the Commission will likely be required to continue to defend the legality of Rule 3902(c) under PURPA in the federal district court proceeding if it does not strike the second sentence of that rule, the Commission resources required to defend the rule in that single proceeding will likely pale in comparison to the litigation that may follow at the Commission, and in court, if it strikes the second sentence of Rule 3902(c) as proposed.

Further, the risk to customers in striking the second sentence of Rule 3902(c) is considerable.  That provision helps ensure that customers pay no more than true utility avoided costs when PURPA's Section 210 "must-buy" obligation is triggered, because that obligation can be triggered only when the QF has been awarded a contract under a

competitive bid or auction or combination process.  Improvident long-term QF contracts with higher costs borne by utility customers litter the landscape in other states.  For instance, as Public Service shared in the July 11, 2018 workshop:

- Idaho Power has experienced a six-fold PURPA generation increase from 2007 to 2015 and expects its power supply expense will have increased 575% from 2004 to 2024 due to PURPA puts.

- A new Michigan forecast methodology has produced a $102/MWh QF rate for solar as applied to Consumers Energy (that methodology currently under review).

- In Pacificorp's territory, QFs have locked in contracts for a decade at rates that exceed forward wholesale prices by $1.2 billion over the 10-year period.

- Alliant's Iowa customers are paying a 20% price premium over a 10-year contract term for QF energy and capacity, and an Alliant representative testified to U.S. Congress last fall that this could result in $45 million in increased electric costs due to one wind project of just 24 MW.[31]

In the final analysis, if the purpose of the proposed amendment to Rule 3902(c) is to "eliminate[] a potentially contradictory provision relating to Qualifying Facilities(QFs) in the Commission's Electric Rules,"[32] and better harmonize Rule 3902(c) with Rule 3615(a), then Public Service respectfully submits that this would be better accomplished through the alternative language Public Service proposes:

A utility shall use a bid or an auction or a combination procedure to establish its avoided costs for facilities with a design capacity of greater than 100 KW. ***EXCEPT AS PROVIDED IN RULE 3615(a), T***~~t~~he utility is obligated to purchase capacity or energy from a qualifying facility only if

---

[31] Testimony of Terry L. Kouba, Alliant Energy, Subcommittee on Energy Committee on Energy and Commerce U.S. House of Representatives, *Powering America: Reevaluating PURPA's Objectives and its Effects on Today's Consumers*, at 2, 7 (Sept. 6, 2017) (providing in part "In one of the examples we cited, the QF developer and owner propose to build a 24 MW wind farm that will be disaggregated in Alliant Energy's Iowa service territory. The QF developer and owner are challenging Alliant Energy's avoided cost rate of approximately $25/MWh, instead seeking an inflated rate of $49.50/MWh for a term of 25 years. If they are successful, Alliant Energy's customers will pay more than $45 million more for energy than if Alliant Energy were to enter into a PPA obtained through a competitive process.")

[32] NOPR at pp. 1-2, ¶ 1.

the qualifying facility is awarded a contract under the bid or auction or combination process.

## **CONCLUSION**

Public Service believes that a simple clarifying edit to Rule 3902(c), to address any perceived inconsistency with Rule 3615(a), would better accomplish the stated objective of the NOPR.    Public Service's proposed alternative language would harmonize any inconsistency between the rules, while retaining, undiluted, the competitive bidding approach to PURPA implementation that has served Colorado well for more than three decades.

Nonetheless, if the Commission does determine to strike the second sentence of Rule 3902(c), Public Service submits that it would be appropriate for the Commission to be clear on two important points.  First, the Commission should expressly state that any such rule change will have prospective effect only, in terms of determining when an electric utility is required to purchase capacity and energy from a QF pursuant to PURPA's Section 210.  Second, given the language in the NOPR discussing other "opportunities" for QFs to receive a contract or legally enforceable obligation from a utility, the Commission should clarify that this statement referred only to Rule 3615(a), and was not meant to suggest other, unspecified paths for QFs to receive a contract or create a legally enforceable obligation notwithstanding the second sentence of Rule 3902(c).

DATED this 24th day of August, 2018.

Respectfully submitted,


By:   */s/ N. Wesley Hunt*
     N. Wesley Hunt, #52174
     Lead Assistant General Counsel
     Xcel Energy Services, Inc.
     1800 Larimer Street, Suite 1100
     Denver, Colorado 80202
     Phone: (303) 294-2556
     Email: wesley.hunt@xcelenergy.com

     and

     Matthew S. Larson, #41305
     Philip J. Roselli, #20963
     Wilkinson Barker Knauer LLP
     1755 Blake Street, Suite 470
     Denver, Colorado 80202
     Phone: (303) 626-2350
     Email: mlarson@wbklaw.com
           proselli@wbklaw.com

     **ATTORNEYS FOR PUBLIC SERVICE COMPANY OF COLORADO**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 24th day of August, 2018, the foregoing Initial Comments of Public Service Company of Colorado were filed, and served by the Colorado Public Utilities Commission solely via its electronic filing system.

/s/ *Amanda C. Clark*
Amanda C. Clark