Colorado PUC E-Filings System

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF COLORADO**

PROCEEDING NO. 18R-0492E

IN THE MATTER OF THE PROPOSED AMENDMENTS TO RULES REGULATING ELECTRIC UTILITIES IN RELATION TO QUALIFYING FACILITIES, 4 CODE OF COLORADO REGULATIONS 723-3-3902(c).

**INITIAL COMMENTS OF
BLACK HILLS COLORADO ELECTRIC, INC.
D/B/A BLACK HILLS ENERGY**

Black Hills Colorado Electric, Inc. d/b/a Black Hills Energy ("Black Hills" or the "Company"), by its undersigned counsel, submits these Initial Comments on the Commission's proposal to strike the second sentence of Rule 3902(c), as set forth in Attachment A to the Commission's Notice of Proposed Rulemaking, Decision No. C18-0601, mailed July 2, 2018, in the above-captioned proceeding ("NOPR"). Black Hills appreciates the opportunity to submit its comments, to express its concerns, and to offer recommendations to the Commission for its consideration in promulgating rule changes with respect to implementation of the Public Utility Regulatory Policy Act ("PURPA") in this proceeding. As discussed below, Black Hills is concerned that the Commission's proposal to strike the second sentence of Rule 3902(c) has not adequately considered the impact it would have on the Commission's related rules, on the efficient operation of utilities, and on non-utility generation developers that have entered into power purchase agreements. Black Hills submits that these issues require thorough vetting to ensure that the Commission's proposal does not negatively impact utility customers. Should the Commission proceed with its proposal to strike the second sentence of Rule 3902(c) to permit acquisitions of PURPA qualifying facilities outside of competitive bidding processes, Black Hills

recommends the Commission impose limitations to ensure the acquisitions do not result in oversupply conditions or increased customer rates.

## I. COMMENTS

### A. The Current Regulatory Framework For Generation Acquisitions Is Cost-Effective and Successful

Before addressing the Commission's instant NOPR, a high-level overview of the Commission's current regulatory framework provides illumination on the State of Colorado's well-functioning energy policies that promote the acquisition of renewable resources. The State of Colorado's renewable energy policy is established by statute in the Renewable Energy Standard ("RES statute"), C.R.S. § 40-2-124. *et seq.* Pursuant to the RES statute, qualifying retail utilities are required to generate a minimum of 30 percent of their retail electricity sales from eligible energy resources in 2020. This standard, and the other requirements of the RES statue, represent the State of Colorado's official and current position on the renewable energy requirements of qualifying retail utilities such as Black Hills. When it was enacted, the RES statute represented a fundamental shift in energy policy in Colorado, as it required qualifying utilities to procure generation resources to meet state requirements, even if those resources were of a higher cost than more conventional, fossil-fuel based generation. To mitigate the cost impact to customers of procuring eligible energy resources, the RES statute contains certain cost-focused provisions, including an annual two percent maximum retail rate impact limitation on customers' total electric bills. Besides this customer-rate protection, the Commission uses its Electric Resource Planning ("ERP") requirements to limit cost impacts to customers, as the ERP

is intended to ensure that acquired generation resources represent the least-cost resource to meet identified needs.[1]

Applied to Black Hills, as discussed in the Commission's Decision No. C18-0432 in Proceeding No. 16A-0436E, Black Hills is currently in the process of acquiring the lowest-cost resources identified in its most recent ERP to comply with its RES obligations. Through this ERP effort, by year 2020, Black Hills expects to have on its system more than 150 megawatts of renewable energy. With these resources, Black Hills will more than achieve long-term compliance with the State of Colorado's renewable energy goals. Black Hills' acquisition of renewable resources through the Commission's ERP and RES processes evidence Black Hills' strong commitment to renewable power in the State of Colorado. Though acquiring renewable resources is tremendously important to Black Hills, just as important to Black Hills is its desire to acquire least-cost resources to ensure its customers do not overpay for their energy and capacity needs.

Having addressed the Commission's well-functioning ERP and RES processes, Black Hills can describe how the Commission currently addresses its PURPA-related rules. As the Commission is fully aware, and as this NOPR specifically regards, the Commission's Rule 3902 includes two separate processes by which to address qualifying facilities under PURPA. First, Rule 3902(b) requires utilities to have tariffs on file with standard rates for qualifying facilities

---

[1] "The Commission exercises its CPCN authority, in part, by conducting long-term resource planning with each of its regulated electric utilities. *See* Rule 3601, 4 CCR 723-3. During the ERP process, the Commission determines the need for additional generation resources by balancing cost-effectiveness, system reliability, and the policy goal of increasing the use of renewable energy resources. *See* § 40-3.2-104(1), C.R.S. ("It is the policy of the state of Colorado that a primary goal of electric utility least-cost resource planning is to minimize the net present value of revenue requirements."); Sec. 1, Legislative Declaration of Intent, § 40-2-124, 2005 Colo. Sess. Laws p. 2336 ("[I]t is in the best interests of the citizens of Colorado to develop and utilize renewable resources to the maximum practicable extent."). The Commission protects the public interest through the ERP process by evaluating the cost-effectiveness of resource plans. Rule 3613(h) ("[T]he Commission shall issue a written [Phase II] decision approving, conditioning, modifying, or rejecting the utility's preferred cost-effective resource plan [.] …"). A resource plan is cost-effective when the "resources … can be acquired at a reasonable cost and rate impact." Rule 3602(c)." Decision No. C15-0373 at ¶ 17 (April 24, 2015) (footnotes excluded).

of 100 kW or less.  Second, Rule 3902(c) requires: (1) utilities to use a bid/auction process to establish avoided costs for qualifying facilities larger than 100 kW; and (2) only requires utilities to purchase capacity/energy from qualifying facilities if they are awarded a contract in the Commission's ERP process.

Black Hills believes these requirements have been successful and effective at serving the best interests of customers.  By requiring PURPA qualifying facilities larger than 100 kW to compete in the ERP process, the Commission has been able to ensure that generation needs are served through competitive processes to ensure least-cost resources.  In addition, the Commission's ERP process has successfully afforded utilities a proper process to ensure that general resource acquisitions are made to address reliability and operational needs.  Simply stated, by normally requiring resource acquisitions to go through the ERP process, the Commission has comprehensively and holistically ensured that utility acquisitions are prudent and in the best interest of customers.

Based on the above, before moving away from engrained Commission practices such as the ERP, the Commission should assess the likely impacts of said action and the related customer costs and benefits.

**B.     The NOPR May Result In Negative Impacts To the ERP**

By striking the second sentence of Rule 3902(c), Black Hills is concerned that potential impacts could occur to the ERP that the Commission has not addressed.  Specifically, the NOPR has not addressed two significant potential impacts to the ERP.

First, Black Hills is concerned that requiring acquisitions of PURPA qualifying facilities outside of the ERP will reduce the programmatic planning efforts that the ERP is intended to facilitate.  As stated in Commission Rule 3601, one of the central purposes of the Commission's ERP "is to establish a process to determine the need for additional electric resources by electric

4

utilities subject to the Commission's jurisdiction and to develop cost-effective resource portfolios to meet such need reliably." *See* Rule 4 C.C.R. 723-3-3601.  As one of the ERP mechanisms by which to meet this purpose, Rule 3610 requires utilities to fully assess their needs to acquire additional, future resources.  Striking the second sentence of Rule 3902(c) could impact the goal of the ERP and frustrate the requirements of Rule 3610 because PURPA qualifying facilities will be able to demand the entering into agreements ("to put") for the purchase of their energy and capacity outside of the ERP, without regard for the need of such resources.  By striking the second sentence of Rule 3902(c), the Commission and utilities will have a much more limited ability to use the ERP process to plan for the resources of the future because a potentially large segment of new generation will be PURPA-qualifying facilities that will not be assessed in the ERP.

If adopted, the proposed rule change will introduce into the utilities' ERP plans considerable uncertainty of the generation that will be on their systems in the future.  As an example, should a utility be preparing for its next ERP, it will need to consider how many PURPA facilities have begun operating on its system, how many proposed new PURPA facilities have a likelihood of entering onto its system, and how many additional, future PURPA facilities may enter onto its system throughout its planning horizon.  Uncertainties such as these will be very difficult, if not impossible, to quantify.  Black Hills thus submits that these uncertainties will reduce the effectiveness of the integrated resource planning efforts of the ERP, reducing a utility's ability to engage in prudent future planning efforts to meet its operational and reliability needs.

Second, Black Hills is concerned that limiting the use of the competitive approach of the ERP will result in overall higher costs.  The ERP process is cost-effective because it uses a

competitive bidding mechanism to meet the utilities' forecasted needs.  As evidenced by Black Hills' most recent ERP, Black Hills received a multitude of competitive bids to meet its projected resource needs.  Should the Commission strike the second sentence in Rule 3902(c), many developers are likely to forego the competitive bidding ERP process and instead seek mandatory purchase of energy/capacity of their facilities through PURPA, regardless of system needs.  The loss of such developer bids in the ERP may likely reduce the competitiveness of the ERP, resulting in higher bids.  These higher bids have significant potential to inflate the otherwise expected results of the competitive bidding process, increasing overall customer costs.  Similarly, although the Commission has not yet specifically addressed how to determine the avoided costs of energy/capacity of large PURPA facilities, if the Commission ties such costs to the ERP process,[2] then any resulting inflated ERP cost will likewise be reflected in inflated avoided costs for PURPA facilities.  The inflated ERP results and inflated avoided costs paid to PURPA facilities would ultimately increase costs to customers.  Black Hills requests consideration of this important matter.

These two identified issues are significant and fundamental changes that may impact the Commission's ERP.  Though these two issues do not represent a comprehensive explanation of every impact to the ERP that the Commission's proposal in its NOPR may have, Black Hills believes these issues represent the bare minimum of ERP impacts the Commission should consider.  These impacts to the ERP weigh on the Commission's decision on whether to strike the second sentence of Rule 3902(c) and whether such an action promotes the public interest.

    **C.**    **The NOPR May Result in Negative Impacts To Utility Systems**

---

[2] The first sentence of Rule 3902(c) directs utilities to use a bidding/auction process to establish avoided costs of PURPA qualifying facilities greater than 100 kW.

As described above, the ERP has been successful in ensuring an orderly process in the acquisition of necessary resources. This process has required that utilities only acquire resources when there is a demonstrated need. After determining there is a demonstrated need for new resources, the ERP facilitates a careful balancing of demand and supply. By striking the second sentence of 3902(c), generation resources are likely to considerably grow on utility systems, even if there is no demonstrated need for such generation, as there will no longer be any balancing of demand and supply. Under the Commission's proposal, PURPA qualifying facilities may seek the purchase of their energy and capacity despite the fact that their facilities will lead to the oversupply of generation that has no demand. Black Hills is concerned that the Commission's NOPR has not considered how the Commission's divesting of its jurisdiction of the balancing of demand and supply may create oversupply conditions that ultimately detriment customers.

These discussed oversupply concerns are not hypothetical, as they have arisen in multiple U.S. States, and there is evidence that oversupply situations may arise on Black Hills' system. For background, Black Hills has roughly 94,500 customers, and it experienced a peak capacity need for generation in 2018 of 413 MW. Black Hills was able to meet its peak capacity need because it has a total installed capacity of 480 MW. Black Hills thus does not have any need for new power.

Nevertheless, six days following the Commission's issuance of the instant NOPR, Black Hills received in Proceeding No. 18A-0524E a request under PURPA that Black Hills purchase the capacity and energy of an 80-MW solar facility. Consistent with this purchase request, which was sought before the Commission has even had an opportunity to act on the instant NOPR, Black Hills fully expects the amount of PURPA qualifying facilities to balloon on Black

Hills' system. Given that Black Hills most recent ERP demonstrated that Black Hills has no need for generation acquisitions until year 2032, the expected precipitous growth of PURPA facilities is likely to result in oversupply conditions on Black Hills' system.

Oversupply conditions from PURPA facilities can create significant operational issues, which may ultimately result in higher customer costs. As a fundamental difference from utility-owned or managed renewable resources, utilities do not have real-time control of the output from PURPA facilities. This difference requires utilities to design their systems around the incorporation of PURPA facilities onto their systems, rather than planning and designing individual utility-owned or managed renewable resources onto their systems to meet actual needs (as they do now). Without providing an exhaustive discussion of negative impacts associated with oversupply conditions, Black Hills submits for consideration the following problems associated with oversupply stemming from PURPA obligations:

- Energy from qualifying facilities have the ability to reduce a utility's need for its base load units below their minimum load capabilities;
- A utility may need to cycle down its base load units on an intra-day basis to balance loads, even though a base load unit may not have been designed for cycling;
- The cycling of baseload units that were not designed for such actions is likely to render their operations more costly;
- Energy from qualifying units is expected to be variable and intermittent, requiring a utility to increase its ramping and reserve margin needs;
- A utility's need for faster ramping resources and to increase its reserve margins may require it to acquire more flexible generation resources, even though *but for*

> the growth of PURPA facilities, the utility would have no need for additional generation;

- Should the above approaches not remediate the oversupply problems from PURPA facilities, a utility may need to consider how to move the excess energy off its system, which is a result that Black Hills submits is inconsistent with the goals and requirements of PURPA.

These described problems are not uncommon in states that do not use competitive bidding for PURPA acquisitions. For example, in North Carolina, due to policies that favored the growth of PURPA qualifying facilities, North Carolina experienced tremendous growth in solar projects outside of integrated planning efforts.[3] This growth in solar projects outside of an integrated resource planning effort had real consequences for North Carolina utilities. In response to these oversupply conditions, the State of North Carolina Utilities Commission found that "increasing amount of solar-powered QFs interconnected to [utility] electric systems is inhibiting the Companies' ability to fulfil its public service mission and statutory obligation to provide safe and reliable energy to its customers at reasonable rates."[4] As one way to mitigate problems associated with oversupply from PURPA facilities, the State of North Carolina required a new process whereby the acquisition of PURPA qualifying facilities would go through a competitive procurement process.[5]

---

[3] North Carolina now has the highest installed capacity of PURPA solar qualifying facilities in the country. *See Electricity Generation in North Carolina: Explaining the Trends*, NC State Economist, at page 2 (Winter 2018), available at: https://cals.ncsu.edu/wp-content/uploads/2018/02/Economist-Fell-1.pdf

[4] *In the Matter of Biennial Determination of Avoided Cost Rates for Electric Utility Purchases from Qualifying Facilities – 2016*, Docket No. E-100, Sub 148, at p. 16, available at: https://starw1.ncuc.net/NCUC/ViewFile.aspx?Id=9b202168-0968-4338-9c64-70b5366ab109

[5] *See, e.g., Avoided Cost Rates For PURPA Qualifying Facilities Decline After House Bill 589 and NC Utilities Commission Order*, Elements For Growth, Deborah Ross (Nov. 21, 2017), available at: https://www.elementsforgrowth.com/2017/11/21/avoided-cost-rates-purpa-qualifying-facilities-decline-house-bill-589-nc-utilities-commission-order/; *New North Carolina Regulatory Order Trims PURPA Avoided Cost Rates*,

The Commission's proposal in the NOPR does not discuss what impacts associated with high-growth of PURPA facilities outside of the ERP will have on utility systems.  To ensure that the Commission's proposal does not ultimately detriment customers, Black Hills requests thorough consideration of the operational issues associated with allowing PURPA facilities to interconnect to utility systems ungoverned by orderly planning and competitive bidding processes.

      **D.**      **The Commission Should Consider Impacts To Existing Power Purchase Agreements Entered Into Through ERP Competitive Bidding**

The Commission's NOPR is likely to result in unintended consequences to existing power purchase agreements that were entered into with non-PURPA generation developers through the Commission's ERP.  As an example of such an impact, a common provision in power purchase agreements is that in certain curtailment situations a utility will pay the developer for energy and related tax benefits associated with energy production.  For instance, Black Hills' Model Energy Purchase Agreement submitted for approval in its most recently completed ERP and RES proceeding contained the following provision (which is not reprinted in its entirety here for purposes of brevity):

> 8.2    <u>Curtailment Energy Payment Rate</u>. If delivery of Renewable Energy is curtailed by Black Hills pursuant to <u>Section 7.4</u>, then (a) Seller shall use reasonable efforts to determine the quantity of Deemed Generated Renewable Energy and (b) Black Hills shall pay to Seller such amounts that Seller would have received from Black Hills under this Agreement had production of the Renewable Energy not been so curtailed and the amount of any Curtailment Tax Benefits to which Seller is entitled but does not receive from any Governmental Authority or third party. . . .

---

Utility Dive, Peter Maloney (Oct. 18, 2017), available at: https://www.utilitydive.com/news/new-north-carolina-regulatory-order-trims-purpa-avoided-cost-rates/507505/.

As this provision provides, should Black Hills need to curtail renewable energy provided under this model agreement, it is possible that Black Hills will need to pay the developer for the energy that would have been produced, as well as any tax benefits associated with that energy.

The curtailment provision discussed above is relevant to PURPA qualifying facilities because it is readily foreseeable that utilities, including Black Hills, will need to engage in curtailments of facilities contracted through power purchase agreements to integrate new PURPA facilities onto their systems. Stated another way, when utilities are forced to purchase energy from PURPA facilities, such energy will displace energy that utilities either own or have contracted for through a power purchase agreement. Should the displaced energy be that contracted for through a power purchase agreement, a utility may need to compensate the developer for the energy that was displaced. This compensation will be in addition to the utility's purchase of energy from the PURPA facilities, resulting in the double payment of energy. The double payment of energy will increase costs to customers, and it would not have occurred *but for* the PURPA facilities.

Black Hills has not yet completed a comprehensive review of all of its power purchase agreements in order to explain to the Commission all of the potential impacts associated with increasing PURPA facilities on its system through the process envisioned in the NOPR. Regardless, Black Hills submits that non-PURPA developers that have complied with the Commission's existing rules have expectations and legal rights that their developed resources will be used consistent with a utility's Commission-approved resource plan. It is fundamentally inequitable to detrimentally impact these developers that complied with the existing ERP process simply because new developers choose to seek procurement outside of the ERP, as the

Commission's NOPR posits.  Black Hills respectfully requests the Commission consider such impacts when ruling on its proposed NOPR.

## II.     RECOMMENDATION

Black Hills recommends the Commission assess the issues discussed above when ruling on its NOPR.  In addition, should the Commission proceed to strike the second sentence of Rule 3902(c), Black Hills recommends the Commission impose limitations on PURPA acquisitions to ensure they do not result in increased customer rates.  There are numerous methods by which the Commission can take actions to address this recommendation.  One such method would involve revising Rule 3902(c) to provide the following (shown in red-line):

(c) A utility shall ~~use~~ file tariffs setting forth a process ~~a bid or an auction or a combination procedure~~ to establish its avoided costs for facilities with a design capacity of greater than 100 kW. The utility is obligated to purchase capacity or energy from a qualifying facility, unless a utility can demonstrate that the purchase of capacity or energy from a qualifying facility is not needed to balance the utility's load and resources or that it will increase rates to customers. ~~only if the qualifying facility is awarded a contract under the bid or auction or combination process.~~

The benefits of this recommendation are twofold.  First, this revised Rule 3902(c) will permit utilities to design and seek Commission approval for just and reasonable tariffs that specifically define how utilities will develop an avoided cost rate for energy and capacity for a qualifying facility under PURPA.  Second, the revised rule includes a limit on a utility's obligation to purchase PURPA-facility capacity or energy in circumstances where it is detrimental to customers through an imbalance of load and resources or an increase in utility rates.  In this circumstance, a utility would bear the burden of demonstrating that purchase of the capacity or energy is not necessary or will increase its rates.  Purchases of capacity or energy from PURPA facilities that will result in an increase in rates are more appropriately reviewed in the Commission's ERP process, so that the Commission will be able to assess if there are more competitive resources that can meet a demonstrated utility need.  By having PURPA developers

compete in the ERP process for acquisitions of their facilities, the Commission will be able to ensure that customers are no worse off from the acquisition as compared to all other potential resource acquisitions.

### III.    CONCLUSION

Black Hills looks forward to discussing these recommendations, providing additional comments, and engaging with other stakeholders during the course of this rulemaking proceeding.

Date:  August 24, 2018

Respectfully submitted,

By: */s/ Tyler E. Mansholt*
  Tyler E. Mansholt, #51979
  Corporate Counsel
  Black Hills Corporation
  1515 Wynkoop Street, Suite 500
  Denver, Colorado  80202
  Telephone: (303) 566-3455
  Tyler.Mansholt@blackhillscorp.com

Attorney for Black Hills Colorado Electric, Inc. d/b/a Black Hills Energy

## CERTIFICATE OF SERVICE

    I hereby certify that on this 24th of August 2018 the foregoing **INITIAL COMMENTS OF BLACK HILLS COLORADO ELECTRIC, INC. D/B/A BLACK HILLS ENERGY** was served via the Public Utilities Commission E-Filing system and will be mailed to those parties not receiving service through the Public Utilities Commission E-Filing system.

By: */s/ Elaine Hegler*